# IN THE COURT OF APPEALS OF IOWA

No. 20-1537
Filed April 13, 2022

**RAMON DEMETRIUS HARPER,**
Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
Respondent-Appellee.
_____

Appeal from the Iowa District Court for Black Hawk County, Bradley J. Harris, Judge.

Ramon Harper appeals the denial of his application for postconviction relief. **AFFIRMED.**

Gina Messamer of Parrish Kruidenier Dunn Gentry Brown Bergmann & Messamer L.L.P., Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Zachary Miller, Assistant Attorney General, for appellee State.

Heard by May, P.J., and Schumacher and Badding, JJ.

**BADDING, Judge.**

Ramon Harper was convicted of attempted murder, willful injury, going armed with intent, and flight to avoid prosecution after he beat a man at a convenience store that had multiple surveillance cameras. According to Harper, the plan at trial was to argue "it wasn't me." But in defense counsel's closing argument, counsel conceded: "That was Mr. Harper. There's no doubt about it and we agree to that."

In his application for postconviction relief, Harper claimed this concession deprived him of his right to control his own defense at trial. He additionally claimed that (1) the composition of the jury panel violated his right to a jury drawn from a fair cross-section of the community; (2) the State engaged in purposeful racial discrimination in jury selection; and (3) his trial counsel was ineffective. On the State's motion, the district court dismissed Harper's fair-cross-section claim and, after a hearing, denied his application in all other respects. Harper challenges those rulings on appeal. For the reasons explained below, we affirm.

## I. Background Facts and Proceedings

In November 2009, Domonique Turner was brutally attacked with a rubber mallet at a convenience store in Waterloo. He suffered repeated blows to the head until several bystanders stepped in to stop the attack. The attacker fled the scene, leaving behind a badly beaten Turner, who was airlifted to the hospital for emergency neurosurgery. The store's surveillance system captured much of the incident, including the assault and the attacker leaving in a silver getaway car. From the video footage and witness descriptions, Waterloo police deduced that

the suspect was a black male, heavyset, between five feet six and eight inches tall, and in his mid-twenties to early thirties.

In trying to identify the suspect, investigators interviewed numerous individuals, including Harper's then-girlfriend, Thorsha Gary, who became a key witness for the State. During her interview, Gary revealed she had been at the convenience store with Harper on the day of the assault. She said she drove him there in a silver car because she thought "he needed to put gas in the car." But according to Gary, Harper went inside the store for "only a couple of minutes" before returning to the car and telling her, "Bitch, drive." Gary stated that after she heard about the attack, she suspected Harper had something to do with it. After being shown a still image of the assailant by the investigators, Gary commented, "That's him hitting the boy." When asked to elaborate, she pinpointed Harper by name. At trial, Turner also identified Harper as the person in the surveillance video, which was admitted into evidence and played for the jury.

In April 2010, Harper was arrested in Atlanta, Georgia, on a warrant for attempted murder. In his interview with investigators, Harper denied any involvement in the brutal assault on Turner. When informed of the video footage, Harper maintained his innocence, declaring: "I was not the one who hit him." He was ultimately charged with attempt to commit murder, willful injury, going armed with intent, and flight to avoid prosecution. Harper pleaded not guilty.

Continuing with his "it wasn't me" defense, Harper filed a motion in limine requesting "no testimony be allowed as to the statements of law enforcement officers that they believe [he] is the person shown in the [surveillance] video." The motion stated, "Said testimony invades the province of the jury in making a

determination as to whether or not the person in the video is in fact [him]."  After hearing arguments from both sides, the district court granted the motion, relying on the prosecutor's assurance that he would not ask any law enforcement witnesses "if based solely upon the video they think that person is Mr. Harper."

The two-week jury trial began in November 2011.  Harper's trial counsel did not give an opening statement, choosing instead to argue a theory of the case for the first time during closing arguments.  In an apparent effort to avoid a conviction for attempted murder, the most serious charge, trial counsel conceded that Harper was the assailant but argued that he lacked the specific intent to kill.  Counsel went on to say that, in his opinion, the evidence showed Harper was, at most, guilty of assault causing serious injury (a lesser included offense of willful injury).  The jury found Harper guilty of all charges.

Harper appealed his conviction for attempted murder, arguing only that there was "insufficient evidence he specifically intended to cause the death of Turner."  *State v. Harper*, No. 12-0781, 2013 WL 3830193, at *1 (Iowa Ct. App. July 24, 2013).[1]  This court affirmed.  *Id.* at *2.  Several months later, Harper filed a pro se application for postconviction relief.  After multiple changes of counsel, Harper's fifth court-appointed attorney filed an amended and supplemental application, raising ineffective-assistance-of-trial-counsel claims, a fair-cross-section claim, and a *Batson* challenge.[2]

---

[1] A letter to Harper from his appellate attorney shows that Harper flagged trial counsel's concession of guilt as an issue.  This issue was apparently not pursued on direct appeal because, according to Harper, his appellate attorney told him that was something he had to raise in a postconviction-relief action.

[2] *See Batson v. Kentucky*, 476 U.S. 79, 80 (1986) ("[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race

A week before the postconviction-relief hearing was scheduled to begin, Harper requested a continuance until the supreme court decided *Thongvanh v. State*, 938 N.W.2d 2 (Iowa 2020) on further review. Harper flagged *Thongvanh* as being potentially "dispositive to [his] fair cross-section claim," noting the relevant issue to be decided in that case was whether *State v. Plain*, 898 N.W.2d 801 (Iowa 2017), which abrogated the exclusive use of the absolute disparity test as a means of proving underrepresentation, applied retroactively to cases on collateral review. The answer to that question would dictate whether Harper could use other statistical methods to prove his fair-cross-section claim under the more defendant-friendly rule announced in *Plain.* Over the State's resistance, the district court granted the continuance.

In January 2020, our supreme court decided that *Plain*'s new rule did "not apply retroactively to cases on collateral review" nor "to convictions that were already final at the time" *Plain* was decided. *Thongvanh*, 938 N.W.2d at 16. On that basis, the State moved to dismiss Harper's fair-cross-section claim, which the district court granted. The court reasoned that *Thongvanh* precluded Harper from relitigating his fair-cross-section claim based on changes in the law that occurred after his conviction became final on collateral review. The remaining claims proceeded to a hearing via videoconferencing in September, all of which were denied. Harper now appeals.

---

or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant.").

## II. Scope and Standards of Review

"We generally review a district court's denial of an application for postconviction relief for errors at law." *Doss v. State*, 961 N.W.2d 701, 709 (Iowa 2021). But because Harper's application alleged ineffective assistance of counsel and constitutional violations, we review his claims de novo. *See Goode v. State*, 920 N.W.2d 520, 524 (Iowa 2018).

We review rulings on a motion to dismiss for correction of errors of law. *Thongvanh*, 938 N.W.2d at 8. We will affirm the district court's grant of a motion to dismiss if "the petition's allegations are taken as true yet fail to state a claim upon which relief may be granted." *Id.*

## III. Analysis

### A. Fair-Cross-Section Claim

We begin with Harper's argument that the district court erred in dismissing his fair-cross-section claim based on its conclusion that *Plain* did not apply retroactively to his case. In reaching that conclusion, the court found *Thongvanh* instructive, if not controlling, as do we.

In *Plain*, the supreme court announced a new rule for evaluating constitutional fair-cross-section claims—"Parties challenging jury pools on the ground that they are unrepresentative may base their challenges on multiple analytical models" such as the absolute disparity, comparative disparity, and standard deviation tests. 898 N.W.2d at 827, *holding modified by State v. Lilly*, 930 N.W.2d 293, 302 (Iowa 2019). In doing so, the court ruled that "it is no longer appropriate to rely exclusively upon the absolute disparity test as an indicator of

representativeness." *Id.* at 826 (overruling *State v. Jones*, 490 N.W.2d 787, 792–93 (Iowa 1992)).

But at the time of Harper's trial, absolute disparity was the exclusive test used in this state for deciding fair-cross-section claims. As a result, when Harper objected to the composition of the jury panel during his criminal trial, the district court overruled the objection on the basis that the absolute disparity in the county where he was tried did not meet the threshold for proving a prima facie fair-cross-section violation under the federal and state constitutions. The prosecutor had successfully dispelled Harper's constitutional argument by pointing out in rebuttal that the total African American population in Black Hawk County was "between 8 and 9 percent," which meant the absolute disparity between the percentage of African Americans in the community and the percentage of the group in the jury panel would never be considered unconstitutional. *See Jones*, 490 N.W.2d at 793 (noting "underrepresentation of as much as ten percent" did not establish a violation of the Sixth Amendment fair-cross-section requirement (citing *Swain v. Alabama*, 380 U.S. 202, 208–09 (1965))).

That was the unfortunate reality until *Plain* abrogated the exclusive use of the absolute disparity test. *See* 898 N.W.2d at 825 ("The shortcoming of the absolute disparity formula is demonstrated by the fact that African-Americans do not represent more than ten percent of the population in any county in Iowa."). *Plain* was decided four years after Harper's conviction became final. Our supreme court has since made clear that "*Plain* does not apply retroactively to cases on collateral review." *Thongvanh*, 938 N.W.2d at 16. *Thongvanh* is controlling.

Still, Harper tries to distinguish his case from *Thongvanh* based on a footnote in which the supreme court ostensibly left open the question of "how a ruling that *Plain* is retroactive would be applied to the case where the defendant made a contemporaneous objection." *Id.* at 15 n.5. He asserts that, unlike Thongvanh, he *did* object to the composition of the jury panel at trial, thereby preserving his challenge for later proceedings. As a result, Harper argues, *Plain*'s new rule should apply retroactively to his case. We disagree with that logic.

As the State points out, Harper did not challenge the exclusive use of the absolute disparity test at trial or attempt to prove the alleged underrepresentation of African Americans on his jury panel using any other statistical method.[3] He instead made a general objection that a jury panel consisting of only one African American did not afford him "a fair representation of his peers." Harper is not now entitled to a second bite at the apple just because the law has changed since then. This is especially so when Harper bases his fair-cross-section claim on alternative methods that were never presented to the district court. To hold otherwise would be inconsistent with the spirit of *Thongvanh*, which found "the need for finality of judgments" outweighed the consideration "that the composition of jury pools can

---

[3] This is not to say that Harper could not have raised an ineffective-assistance claim related to his trial counsel's failure to pursue those other options. Indeed, in its ruling on the State's motion to dismiss, the postconviction court reserved counsel's "alleged failure to adequately advance a fair-cross-section claim" for later determination so that an adequate record could be developed. But at the evidentiary hearing that followed, Harper did not raise this issue so the court did not rule on it. We accordingly decline to consider the claim on appeal. *See Lamasters v. State*, 821 N.W.2d 856, 862 (Iowa 2012) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal." (quoting *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002))).

have real-world effects." *Id.* at 15. Under the absolute disparity test that was the law at the time Harper's conviction became final, his claim failed as a matter of law. *See Hall v. State*, No. 20-1183, 2021 WL 4304242, at *2 (Iowa Ct. App. Sept. 22, 2021).

For the same reason, we reject Harper's alternative argument that this court should hold "there is room to apply *Plain* retroactively under the Iowa Constitution." This identical issue was raised and decided in *Thongvanh*, which we have already determined is controlling. *See* 938 N.W.2d at 16 (rejecting argument that *Plain* should apply retroactively under "the Iowa Constitution's due process and equal protection guarantees"). We are not free to overrule controlling supreme court precedent. *State v. Hastings*, 466 N.W.2d 697, 700 (Iowa Ct. App. 1990). Thus, we affirm the postconviction court's dismissal of the fair-cross-section claim.

### B. Concession of Guilt

We now turn to what we consider to be Harper's strongest claim for relief: that his trial counsel infringed on his "right not to admit guilt" by conceding he was the assailant during closing argument without his consent. Harper argues his counsel's unilateral concession of guilt amounted to structural error under *McCoy v. Louisiana*, 138 S. Ct. 1500, 1506 (2018), entitling him "to automatic reversal without a showing of prejudice." Because Harper raised this argument for the first time in postconviction-relief proceedings, the district court found it was barred by Iowa Code section 822.8 (2013),[4] although the court then proceeded to

---

[4] Section 822.8 provides:

> All grounds for relief available to an applicant under this chapter must be raised in the applicant's original, supplemental or amended application. Any ground . . . not raised, or knowingly,

deny the claim on the merits as well. Determining whether the claim is barred by section 822.8 would require us to wade into the murky waters of whether, as Harper argues, "a *McCoy* claim is, in essence, an ineffective-assistance-of-counsel claim."[5]  *See Allison v. State*, 914 N.W.2d 866, 888 (Iowa 2018) (explaining the bar of section 822.8 can be avoided if counsel ineffectively fails to raise a claim at trial or on appeal); *see also* Iowa Code § 814.7 (codifying the appellate practice of preserving ineffective-assistance claims for postconviction-relief proceedings). We elect to bypass that question because, like the district court, we find Harper's claim fails on its merits.

The United States Supreme Court recognized a criminal defendant's "constitutional right to conduct his own defense" in *Faretta v. California*, 422 U.S. 806, 819 (1975). While not expressly stated in the Bill of Rights, the Court

___

voluntarily, and intelligently waived in the proceeding that resulted in the conviction or sentence, or in any other proceeding the applicant has taken to secure relief, may not be the basis for a subsequent application, unless the court finds a ground for relief asserted which for sufficient reason was not asserted or was inadequately raised in the original, supplemental, or amended application.

[5] In *Krogmann v. State*, 914 N.W.2d 293, 322–34 (Iowa 2018), our supreme court emphasized the importance of distinguishing "between claims of ineffective assistance of counsel and other claims based on the Sixth Amendment (and article I, section 10 of the Iowa Constitution) . . . such as the right to conduct one's own defense." *Accord McCoy*, 138 S. Ct. at 1510–11 ("Because a client's autonomy, not counsel's competence, is in issue, we do not apply our ineffective-assistance-of-counsel jurisprudence . . . to McCoy's claim."). But the *Krogmann* court then noted that while the applicant's claim was "couched in terms of ineffective assistance of counsel," the "underlying claim" was that he was prevented "from being the master of his own defense in violation of the Sixth Amendment and the Iowa Constitution" under the *McCoy* line of cases. 914 N.W.2d at 318. Relying on that underlying "master of his own defense" claim, the court concluded that a "showing of *Strickland* prejudice" was not required in postconviction proceedings "involving an unpreserved structural error at trial that is challenged via an ineffective-assistance claim." *Id.* at 322–25. *Krogmann* did not address the applicability of section 822.8 to the claim before it.

determined that "the right to self-representation—to make one's own defense personally" was rooted in the Sixth Amendment and, more specifically, the right to counsel. *Faretta*, 422 U.S. at 819. The Court reasoned that because the right to defend is personal, even when the defendant makes a decision "ultimately to his own detriment, his choice must be honored." *Id.* at 834.

Given the inherent tension between a defendant's right to conduct his own defense and his right to the assistance of counsel, the Supreme Court clarified the scope of these guarantees in *Florida v. Nixon*, 543 U.S. 175, 189–92 (2004). Nixon faced a possible death sentence after refusing to plead guilty to four felony charges, including first-degree murder. *Nixon*, 543 U.S. at 180–81. Based on his experience in capital defense, Nixon's attorney believed the best strategy for Nixon to avoid the death penalty was to concede guilt at trial in order to receive leniency from the court at the penalty phase. *Id.* at 181. Despite being informed of this strategy, "Nixon was generally unresponsive"—"[h]e never verbally approved or protested" his attorney's proposal. *Id.* Making a judgment call, Nixon's attorney admitted Nixon caused the death of the victim during his opening statement. *Id.* at 182.

On direct appeal, Nixon's appellate counsel argued trial counsel "had rendered ineffective assistance by conceding Nixon's guilt without obtaining Nixon's express consent." *Id.* at 185. Following a remand for further development of the record on the consent issue, Nixon unsuccessfully sought postconviction relief. On appeal from those proceedings, the Florida Supreme Court reversed Nixon's convictions and remanded for a new trial on the ground that counsel's performance was presumed deficient because counsel conceded guilt without

obtaining Nixon's affirmative consent. *Id.* at 186. In reversing that decision, the United States Supreme Court held: "When counsel informs the defendant of the strategy counsel believes to be in the defendant's best interest and the defendant is unresponsive, counsel's strategic choice is not impeded by any blanket rule demanding the defendant's explicit consent." *Id.* at 192. In rejecting the presumption of deficient performance applied below, the Court noted counsel's strategy under these circumstances was subject to the traditional *Strickland* standard. *Id.*; *see Strickland v. Washington*, 466 U.S. 668, 687 (1984).

From there, the Supreme Court addressed the issue on which Harper bases his claim for relief: "whether it is unconstitutional to allow defense counsel to concede guilt over the defendant's intransigent and unambiguous objection." *McCoy*, 138 S. Ct. at 1507. In answering yes, the Court reasoned that while counsel may have reasonably believed that admitting guilt was the best strategy given the possible death sentence, counsel's concession over McCoy's strenuous and express objections violated McCoy's "protected autonomy right" under the Sixth Amendment. *Id.* at 1511. Such violation constitutes a structural error requiring a new trial. *Id.* Emphasizing the constitutional underpinning, the Court declared: "When a client expressly asserts that the objective of '*his* defence' is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt." *Id.* at 1509.

Against that backdrop, Harper contends the circumstances here are akin to those in *McCoy*. He relies on his own testimony at the postconviction-relief hearing to support his claim that his trial counsel's concession of guilt without his consent amounted to structural error. The State, on the other hand, discredits Harper's

testimony as "self-serving" and argues Harper cannot prove a violation under *McCoy* in any event because "he never objected or complained" about his counsel's concession in the district court. We find the State's position more convincing.

As we see it, Harper's argument boils down to this: he did not consent to his trial counsel's concession of guilt; he did not want to concede guilt; and therefore his trial counsel's unilateral decision to do so anyway amounted to structural error. There are two problems with this line of reasoning. First, given the inadequacy of the trial record as already discussed, the only evidence presented by Harper on this issue is his own uncorroborated testimony.[6] Having reviewed the transcripts from Harper's criminal trial and the transcript from the postconviction-relief hearing, we agree with the State that the testimony is self-serving.

As the State points out, Harper was no shrinking violet during the trial court proceedings. He filed several pro se requests for a new attorney and was not shy about speaking up during pretrial hearings. Tellingly, after the trial was over, Harper did raise an issue about his attorney's performance with the district court— but it wasn't about the concession of guilt. Instead, when given the chance to say something at the hearing on his motion for a new trial, Harper focused on counsel's failure to inform him about a plea offer from the State. And at the sentencing while exercising his right of allocution, Harper questioned the court: "I would like to

---

[6] Because Harper's trial counsel passed away in the early stages of the postconviction-relief proceeding, we have no record of counsel's thought processes or corroboration for Harper's side of the story.

understand how I didn't . . . get a new trial . . . just for the simple fact that my lawyer didn't tell me about the deal that was offered before the trial." We accordingly view Harper's testimony at the postconviction hearing that his counsel "took it upon himself to admit my guilt when he knew that wasn't my trial strategy" with some skepticism. This is especially so considering the various other statements Harper made at the postconviction hearing suggesting that what he viewed as "trial strategy" was merely an expectation that his counsel would "go to trial to prove that it wasn't [him]." On this bare-bones record, we cannot draw the inferences that Harper urges.

The second problem is that Harper's claim does not fit within the parameters of the Supreme Court's structural-error analysis on which he seeks relief. The *McCoy* Court set the stage for its decision by contrasting the facts of *Nixon* with the facts before it. *Id.* at 1505. In doing so, the Court signaled that the pertinent inquiry in the context of an alleged violation of a defendant's protected autonomy right is whether the defendant "adamantly objected" to the admission of guilt or, inversely, neither objected nor consented. *See id.* The Court in *McCoy* took pains to describe the nature of the objection in the case before it, describing McCoy's objections to any concession of guilt as "vociferous," "adamant[]," "intransigent," "unambiguous," "repeated," "intractable," "strenuous," and "insistent." *Id.* at 1505, 1507, 1510, 1512. Nothing close appears in the record before us.

What complicates this case above all else is that there is simply no evidence that Harper and his counsel ever discussed trial strategy, let alone had "intractable disagreements about the fundamental objective of [Harper's] representation." *See id.* at 1510. At most, we have a record that shows Harper and his counsel were

on the same page about denying Harper's identity in the surveillance video up until the close of all the evidence. While this might suggest that counsel changed or developed the trial strategy after the State's case-in-chief and therefore had a duty to discuss it with Harper in advance, *see Nixon*, 543 U.S. at 189, that does not translate into a *McCoy* violation. *See, e.g.*, *United States v. Felicianosoto*, 934 F.3d 783, 787 (8th Cir. 2019) (rejecting *McCoy* claim where the record did not reflect that the defendant "made any 'express statements of [his] will to maintain innocence' in response to his attorney's concessions, either to his counsel or the court" (citing *McCoy*, 138 S. Ct. at 1509)); *People v. Bernal*, 256 Cal. Rptr. 3d 269, 275 (Cal. Ct. App. 2019) (interpreting *McCoy* to "require express disagreement with counsel for a claimed constitutional violation to have merit in this context" and finding no such violation where the record did not show the defendant "instructed counsel not to concede guilt on the relevant charges in closing argument, nor did he ask to replace appointed counsel because of disagreement over trial strategy").

Given the circumstances of this case and the limited evidence offered, we decline to find a structural error or presume prejudice based on counsel's concession of guilt.

### *C.* Batson *Challenge*

Harper reprises a third constitutional argument, this one premised on the Equal Protection Clause of the Fourteenth Amendment "and the constitutional prohibition on exclusion of persons from jury service on account of race." *Batson*, 476 U.S. at 91. He contends the prosecutor's use of a peremptory challenge to strike the only African American member on the jury panel violated his equal protection rights. While our review of Harper's *Batson* challenge is de novo, we

afford great deference to the district court's credibility determinations when considering "the true motives of the attorney when making strikes." *State v. Mootz*, 808 N.W.2d 207, 214 (Iowa 2012).

A *Batson* challenge follows three steps. First, the defendant must make a prima facie showing that the State used its peremptory challenges to exclude prospective jurors on the basis of race. *State v. Knox*, 464 N.W.2d 445, 448 (Iowa 1990). Second, the burden then shifts to the State to provide "a clear and reasonably specific and neutral explanation for the peremptory challenge." *Id.* And third, the court must decide whether purposeful discrimination exists based on the reasons presented by State. *Id.*

The issue here is narrow in that Harper challenges only the postconviction court's determination of purposeful discrimination rather than the one reached by the original trial court. According to Harper, the postconviction court erred in finding the State provided a race-neutral reason for striking A.C., an African American woman and the sole prospective juror who was of the same race as Harper. In support, Harper points to the more developed record in the postconviction proceeding, which reveals that the prosecutor in his criminal case clarified some statements he made when articulating his race-neutral reasons before the trial court.

At that time, the prosecutor offered two main reasons for striking A.C. from the jury panel: (1) she was the only potential juror with "a prior domestic abuse conviction"; and (2) she was the only one the prosecutor had personally prosecuted while he was an assistant county attorney with the Black Hawk County Attorney's Office. He elaborated:

> I remember prosecuting [A.C.'s] domestic abuse a few years ago. I struck her because this was obviously an assault-related case, I didn't want anyone with assault convictions on the panel, nor anyone that I personally have prosecuted or frankly even that the office had prosecuted while I was there. It was because of the assault domestic abuse conviction that she was stricken.

Convinced by the prosecutor's first explanation, the trial court overruled Harper's *Batson* challenge. The court reasoned that it was not improper for the prosecutor "to strike a potential juror who ha[d] assaultive history and ha[d] a prior conviction for assault, since this is an assault case."

On postconviction relief, Harper claimed "the State violated [his] equal protection and due process rights by providing false information to the court to survive his *Batson* challenge." The prosecutor was subpoenaed to testify at the postconviction-relief hearing, where he admitted upon reviewing the relevant files that he had made a mistake in stating A.C. had a prior conviction for domestic abuse assault. The prosecutor reflected, "I have since discovered that that was not accurate, it was negotiated down, but it began as a domestic abuse complaint." He also acknowledged that two other potential jurors had prior convictions as well, although they were unrelated to any violent crimes. Plus, one of them had disclosed a "bad personal incident" with the then-county attorney during voir dire, yet still ended up serving on the jury.

Now on appeal, Harper argues the prosecutor's misstatements "undermine[d] a finding that the use of the peremptory challenge was race neutral." Even with the benefit of a fuller record, the postconviction court was not swayed by Harper's argument, and neither are we. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race

neutral." *Hernandez v. New York*, 500 U.S. 352, 360 (1991). Because the reasons offered by the prosecutor were facially valid given the facts of Harper's criminal case and thus race neutral, we decline to disturb the postconviction court's ruling. *See State v. Griffin*, 564 N.W.2d 370, 375 (Iowa 1997) (noting the race-neutral explanation must be "related to the particular case to be tried" (quoting *Batson*, 476 U.S. at 98)); *see also State v. Veal*, 930 N.W.2d 319, 334 (Iowa 2019) (recognizing juror's prior interaction with legal system constitutes a valid, race-neutral reason).

### D. Ineffective Assistance of Counsel

Finally, we address a string of Harper's ineffective-assistance claims with regard to his right to waive a jury trial and various evidentiary issues. In doing so, we apply the two *Strickland* prongs: (1) counsel's breach of an essential duty and (2) prejudice. *See* 466 U.S. at 687.

### 1. Failure to Inform of Right to Waive Jury Trial

Harper argues he received ineffective assistance because his trial counsel failed to advise him of "his right to waive trial by jury and proceed to a bench trial." He claims he suffered prejudice due to counsel's failure because a bench trial would have been more favorable to him, given the "inconclusive" eyewitness testimony presented by the State. We disagree. Even if Harper had been informed of his right to waive a jury trial and exercised that right, he fails to "show a reasonable probability that the result of the trial would have been different." *See State v. Ambrose*, 861 N.W.2d 550, 557 (Iowa 2015).

After independently reviewing the record, we are not convinced that a bench trial would have yielded a different result. Harper suggests that a judge, rather

than a jury, would have been better able to recognize the gaps in the various eyewitness identifications made at trial. But even assuming the eyewitness identifications were "inconclusive" on their own, they were corroborated by other evidence to support a conviction. While unclear, Harper appears to be arguing, for instance, the fact that "Turner, the victim, was impeached," should have discredited Turner's testimony altogether. Yet, in our view, it had the opposite effect because it allowed the State to bring in rebuttal evidence explaining the inconsistencies in the testimony, which we will discuss later. More significantly, it is clear from the record that the State did not rely on Turner's testimony for his eyewitness identification. Instead, he was called on to testify about what he remembered before and after his attack, the severity of his injuries, and Harper's possible motive. The other witnesses mentioned by Harper were likewise more useful to the State's case-in-chief than just their individual identifications.

Viewing the record as a whole, Harper cannot show he was prejudiced by his trial counsel's failure to inform him of his right to waive a jury trial. Thus, his ineffective-assistance claim fails. *See id.* at 556 ("We can resolve ineffective-assistance-of-counsel claims under either prong of the analysis.").

### 2. Motion in Limine Ruling

Harper next argues his trial counsel was ineffective for failing "to object to inadmissible evidence," namely the State's crime scene technician's testimony that repeatedly referred to the person in the surveillance video as "the defendant." He asserts this testimony was objectionable as a violation of the district court's motion in limine ruling prohibiting any law enforcement officers from identifying him as the person in the video. For counsel to have breached an essential duty on this

ground, the crime scene technician must have violated the motion in limine ruling by referring to "the defendant." We find the ruling was not violated.

At the motion in limine hearing, the prosecutor was fully transparent with the trial court and the defense that members of law enforcement who were involved in Harper's case were likely going to identify Harper as the assailant when describing what they discovered throughout the investigation. The prosecutor explained: "[W]e're talking about over the course of the investigation and the multiple witness statements and things of that nature, there may be times when the officers are going to say that's clearly this individual given what we now know." The court thought the prosecutor's position was "fair enough" and narrowly ruled that no law enforcement witnesses could be asked to identify Harper in the surveillance video at trial. The prosecutor confirmed: "I don't intend to ask anybody—any of the officers whether you watched the video; does that look like him to you?"

Based on this motion in limine ruling, we find nothing objectionable in the prosecutor's questioning or the challenged testimony. While the crime scene technician did say "the defendant" throughout his testimony, his references were made in the specific context of the work he conducted during the initial investigation, which had included sweeping the crime scene and reviewing the surveillance footage. As the crime scene technician, he was naturally going to testify about his observations of all the evidence gathered during that process, including the video. Because the testimony did not violate the motion in limine ruling, Harper's trial counsel could not have breached an essential duty in failing to object to the crime scene technician's testimony on that basis. As a result, this ineffective-assistance claim also fails.

### 3. Bribery Testimony

Harper's third contention relates to his trial counsel's failure to object to testimony not included in the State's minutes of evidence. He complains the prosecutor improperly elicited surprise testimony that Turner was offered $10,000 from Harper's cousin to sign a "Voluntary Statement" stating, "I Domonique Turner have no clue who hit me . . . . Far as anything else goes I have no idea what the[y're] talking about." But because it was the defense that offered that statement into evidence in the first place to impeach Turner during cross-examination, the bribery testimony was admissible as rebuttal evidence.

"Rebuttal evidence is that which explains, repels, controverts, or disproves evidence produced by the opposing party." *Carolan v. Hill*, 553 N.W.2d 882, 889 (Iowa 1996). And it is generally "confined to new matters first introduced by the opposing party." *Id.* Given the district court's "considerable discretion in admitting rebuttal evidence," the admission of the challenged evidence must have been "a clear abuse of discretion" for us to predicate error. *Id.* We find no such abuse here.

The record shows the bribery testimony was elicited by the prosecutor only after defense counsel had impeached Turner with the written statement purportedly signed and filed by Turner while Harper's criminal case was pending. Because Turner gave inconsistent responses to defense counsel's persistent questioning about whether he remembered writing the statement, if at all, the prosecutor had reason to follow up on redirect examination and ask Turner whether the statement was made voluntarily. Notably, the prosecutor's follow-up was brief and circumscribed to that purpose: "Did that offer of money affect in any

degree what you said in those documents?  Was it a factor that you were thinking about?"  Turner replied, "It was."  This line of questioning was not improper.  Nor were Turner's responses inadmissible.  Because the bribery testimony was proper rebuttal evidence put forth by the State, Harper's trial counsel did not have an essential duty to object to its admission.  Thus, we find no breach under the first *Strickland* prong.

### 4. Inconsistent Statements

We turn to Harper's fourth and final claim of ineffective assistance.  He contends his trial counsel breached a duty to adequately impeach Gary, his then-girlfriend, with her inconsistent statements at trial.  He concludes, "If the jury had been exposed to the impeachment evidence, there is a reasonable chance that the outcome of trial would have been different."  We disagree.

The record reveals that Harper's trial counsel asked Gary several times on cross-examination if she recalled telling him during her deposition that she could not identify who the assailant was when initially questioned by investigators.  But because that statement differed from what Gary had just described during her direct-examination, the jury could have pieced together the inconsistency without Gary confirming that was true.  Thus, despite Gary's inconclusive answers, counsel's questioning was specific enough to flag the issue in front of the jury.  Like the others, this claim is rejected for failure to establish counsel's breach of an essential duty.

Notwithstanding the above, Harper makes a final effort to obtain relief by arguing "the cumulative errors combined to deprive [him] of the right to a fair trial." *See Schrier v. State*, 347 N.W.2d 657, 668 (Iowa 1984) (considering all

ineffective-assistance claims "individually and cumulatively" to determine whether reversal is warranted). "Where, as here, 'the court is assessing multiple claims and assumes without deciding counsel breached an essential duty,'" as we did with Harper's claim regarding his right to waive a jury trial, "'then the reviewing court should consider whether the assumed breaches, cumulatively, resulted in *Strickland* prejudice.'" *Pantaleon v. State*, No. 19-1254, 2021 WL 592928, at *4 (Iowa Ct. App. Feb. 3, 2021) (quoting *State v. Jones*, No. 16-1828, 2018 WL 1858296, at *7 (Iowa Ct. App. Apr. 18, 2018))); *accord State v. Clay*, 824 N.W.2d 488, 501–02 (Iowa 2012).

We sidestepped the breach-of-duty question in relation to only one of Harper's claims, which we concluded did not result in prejudice. Any breach that may have occurred with that claim does not undermine our confidence in the outcome, *see Strickland*, 466 U.S. at 694, so we reject the cumulative-error claim, *see Pantaleon*, 2021 WL 592928, at *4; *accord Clay*, 824 N.W.2d at 501–02.

### IV. Conclusion

We affirm the denial of Harper's application for postconviction relief.

**AFFIRMED.**